# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SPGGC, INC.,
      Plaintiff,

   v.

RICHARD BLUMENTHAL,
      Defendant.

CIVIL ACTION NO.
3:04cv1919 (SRU)

## RULING ON MOTION FOR RECONSIDERATION

The plaintiff, SPGGC, Inc. ("SPGGC"), has moved pursuant to Rule 7(c) of the Local

Rules of Civil Procedure for reconsideration of the court's July 28, 2005 ruling on defendant

Attorney General Richard Blumenthal's Motion to Dismiss ("Ruling").  The Ruling dismissed

SPGGC's complaint, thereby rejecting SPGGC's claim that the Connecticut Gift Card Law

("CGCL")[1] is preempted by the National Bank Act ("NBA")[2] or violates the Commerce Clause.

Although I grant the motion for reconsideration, I deny the relief requested.

### I.  Standard of Review

#### A.  Reconsideration

In general, there are three grounds that may justify reconsideration: (1) an intervening

change of controlling law; (2) the availability of new evidence; or (3) the need to correct a clear

---

[1] There are several Connecticut statutes at issue in this case, which will be referred to collectively as the Connecticut Gift Card Law ("CGCL") throughout.  Whenever the term CGCL is used, it includes the following statutes: The Connecticut Gift Card Law, 2003 Conn. Pub. Acts 03-1, §§ 83, 84(a) (June 30, 2003, Special Session), now codified as Conn. Gen. Stat. §§ 42-460, 3-65c and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a *et seq.*

[2] 12 U.S.C. § 21 *et seq.*

-1-

error or prevent manifest injustice.  *Virgin Atlantic Airways, Ltd. v. National Mediation Bd.*,  956 F.2d 1245, 1255 (2d Cir. 1992).  The standard for granting a motion for reconsideration is strict. *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).  A "motion for reconsideration may not be used to plug gaps in an original argument or to argue in the alternative once a decision has been made."  *Lopez v. Smiley*,  375 F. Supp. 2d 19, 21-22 (D. Conn. 2005).   It is also not appropriate to use a motion to reconsider solely to re-litigate an issue already decided.  *Id.*  A motion to reconsider should be denied, "unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court."  *Id.*

### B.  Failure to State a Claim

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure should be granted only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."  *Hishon v. Spalding*, 467 U.S. 69, 73 (1984).  The function of a motion to dismiss is "merely to assess the legal feasibility of a complaint not to assay the weight of evidence which might be offered in support thereof."  *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984).  The motion must therefore be decided solely on the facts alleged.  *See Goldman v. Belden*, 754 F.2d 1059, 1065 (2d Cir. 1985).

When deciding a motion to dismiss for failure to state a claim upon which relief can be granted, the court must accept the material facts alleged in the complaint as true, and must draw all reasonable inferences and view them in the light most favorable to the plaintiff.  *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).  The court "must not dismiss the action unless it appears

beyond doubt that the plaintiff can prove no set of facts in support of his claim which would

entitle him to relief." *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994).  The issue is not

whether the plaintiff will prevail, but whether he should have the opportunity to prove his claims.

*See Conley v. Gibson*, 355 U.S. 41, 45 (1957).

**II.  Discussion**

A.  Preemption

The CGCL does not irreconcilably conflict with the NBA, because (1) compliance with

both is physically possible, and (2) compliance with the CGCL is not an obstacle to the execution

of the full purposes and objectives of Congress in enacting the NBA.

In analyzing a preemption claim, courts must "start with the assumption that the historic

police powers of the States [are] not to be superseded by [federal law] unless that [is] the clear

and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947);

*Cliff v. Payco General American Credits, Inc.*, 363 F.3d 1113, 1122 (11th Cir. 2004); *Maryland

v. Louisiana*, 451 U.S. 725, 746 (1981).  If the preemption claim is potentially valid, courts must

narrowly  interpret it.  *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).  That is because the

power to preempt state law is an extraordinary power "that we must assume Congress does not

exercise lightly." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).  One historic police power is

consumer protection, which is an area traditionally regulated by the states.  *Cliff v. Payco

General American Credits, Inc.*, 363 F.3d 1113, 1125 (11th Cir.  2004);  *Florida Lime &

Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 135 (1963).

Preemption can occur in three ways: (1) when there is language revealing an explicit

intent by Congress to preempt state law; (2) in the absence of explicit language, when the federal

statute's structure and purpose or nonspecific statutory language nonetheless reveal a clear, but

implicit, preemptive intent, i.e., where, based on the pervasiveness of the federal statute, it is

reasonable to infer that Congress intended to leave no room for state law; or (3) when the federal

law is in "irreconcilable conflict" with the state law, meaning either compliance with both laws is

a physical impossibility or where the state law is an obstacle to the "accomplishment and

execution of the full purposes and objectives of Congress." *Barnett Bank v. Nelson*, 517 U.S. 25,

31 (1996) (holding that where a federal statute authorized an activity that the state statute forbid,

the two laws were in irreconcilable conflict with one another).

The third type of preemption, "conflict preemption," is potentially at issue in this case.

Conflict preemption encompasses two types of conflict: (1) where compliance with both the

federal and state law is a physical impossibility, and (2) where compliance with the state law is

an obstacle to the full purposes and objectives of Congress.  Here, compliance with the CGCL

and the NBA is not a physical impossibility.  It is possible for Connecticut to regulate gift card

sales more strictly than the federal government and for SPGGC to comply with both laws.

Where the NBA is either silent or authorizes a particular activity that the CGCL restricts,

SPGGC can physically comply with both.

Additionally, complying with both laws would not frustrate the purpose and objectives of

Congress in enacting the NBA  In defining the preemptive scope of statutes and regulations

granting a power to national banks:

> normally Congress would not want States to forbid, or to impair significantly,
> the exercise of a power that Congress explicitly granted.  To say this is not to
> deprive States of the power to regulate national banks, where . . . doing so
> does not prevent or significantly interfere with the national bank's exercise of
> its powers.

*Id.* at 33.  In addition to federal statutes, federal regulations also have preemptive effect. *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 314 (2d Cir. 2005).  That is because Congress has recognized the Office of the Comptroller of the Currency's ("OCC") power to preempt state laws by issuing opinion letters and interpretive rulings.  *Id.*  The OCC has issued a regulation providing that "[e]xcept where made applicable by Federal law, state laws that obstruct, impair, or condition a bank's ability to fully exercise its powers authorized under federal law do not apply to national banks."  12 C.F.R. § 7.4009(b) (2004).

SPGGC contends that the CGCL, in regulating expiration dates and fees associated with gift cards, conflicts with federal law in several major ways:  (1) federal law allows national banks to charge non-interest fees; (2) federal law allows national banks to issue stored electronic value cards; and (3) federal law allows national banks to issue such cards with expiration dates. Indeed, the OCC has authorized national banks to impose fees on their customers: "[a] national bank may charge its customers non-interest charges and fees. . . ."  12 C.F.R. § 7.4002 (2001). The  OCC has also authorized national banks to provide electronic stored value systems.  12 C.F.R. §  7.5002(a)(3) (2004).  Because the OCC explicitly authorizes national banks to charge its customers fees, any state law that impairs a national bank from exercising its federally authorized power to charge fees could arguably be preempted by the NBA.  The rationale underlying that conclusion is that Congress has clearly expressed its intent for national banks to be regulated by federal authority.  *Wachovia Bank*, 414 F.3d at 314.  Complying with both laws could cause an irreconcilable conflict, because the OCC has ruled that, when it explicitly authorizes a national bank to exercise a power, a state may not infringe that authorization.

Notwithstanding the possibility that federal law might authorize national banks to engage

in the activities described above, SPGGC's compliance with the CGCL as applied in this case is not an obstacle to the purposes and objectives of Congress in enacting the NBA.  The purpose of the NBA is to regulate national banks, not SPGGC, which is a non-bank affiliate of a national bank, and the CGCL does not purport to regulate national banks.

The purpose of the NBA is to regulate national banks.  *Weiner v. Bank of King of Prussia*, 358 F. Supp. 684, 687 (E.D. Pa. 1973) (confirming that the purpose of the NBA is to regulate national banks and only national banks); *Wiley v. Federal Land Bank of Louisville*, 657 F. Supp. 964, 965 (S.D. Ind. 1987); *Criswell v. Production Credit Assoc.*, 660 F. Supp. 14, 16 (S.D. Ohio 1985) ("[i]t is well settled that the National Bank Act regulates only the conduct of national banks"); *Carson v. H & R Block, Inc.*, 250 F. Supp. 2d 669, 674-75 (S.D. Miss. 2003) (holding that the NBA regulates only the business of banking).  An entity that is neither a national bank, nor a wholly-owned subsidiary of a national bank may not claim preemption based on the NBA, and the fact that a non-bank entity claims to have an agency or business relationship with a national bank does not give that entity the right to claim preemption based on the NBA.  *See Colorado ex rel. Salazar v. ACE Cash Express, Inc.*, 188 F. Supp. 2d 1282 (D. Colo. 2002) (entity with an agency relationship with a national bank cannot claim preemption because the NBA regulates only national banks.  "[I]n this case Defendant and the national bank are separate entities and their relationship does not give rise to complete preemption under the NBA . . . this case is about a non-bank's violations of state law."); *Brown v. ACE Cash Express, Inc.*, No. 01-2674, 2001 U.S. Dist. Lexis 25847 (D. Md. Nov. 14, 2001) (holding that an agency relationship is not sufficient to make the NBA applicable to a non-bank entity and distinguishing an agency or contractual relationship from a subsidiary-owner relationship); *Long v. ACE Cash Express*, 2001

U.S. Dist. Lexis 24617 (M.D. Fla. 2001) (holding that the NBA does not preempt state law where the relevant party is not a national bank).  Therefore, even if SPGGC could develop facts that would establish that it has an agency relationship with the Bank of America ("BOA"), that would be irrelevant to its preemption claim.

SPGGC is not a national bank, a subsidiary of a national bank, or owned by a national bank; it is a corporation that operates shopping malls and sells Visa pre-paid gift cards issued by the Bank of America ("BOA").  At best, SPGCC has a close agency or business relationship with the BOA, and under the relevant case law, SPGGC does not acquire national bank status by affiliating itself with a national bank.  SPGGC earns a profit from the Simon gift cards by charging monthly maintenance fees.  SPGGC's Complaint ¶ 19.  BOA does not profit from the monthly maintenance fees.[3]  Rather, BOA earns its profit on the card by way of the interchange fees from Visa on a per-transaction basis.  SPGGC's Complaint ¶ 18.

Moreover, the CGCL is a consumer protection law that regulates the sale of gift cards. The CGCL does not purport to regulate the conduct of national banks; if it did, it might be preempted by the NBA.  If the BOA was the plaintiff in this case, a different analysis might be required, but the BOA is not a plaintiff.  As a result, the protections of the NBA simply do not apply to SPGGC, and therefore the CGCL, as applied against SPGGC, is not preempted by the NBA.

On reconsideration, SPGGC argues that *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 314 (2d Cir. 2005), should control, but in that case, the Second Circuit held that a state law was

---

[3] Although SPGGC's Proposed Supplemental Complaint indicates that all fees are initially paid directly to BOA, it does not claim that the BOA keeps those fees as part of its profit.  Proposed Supplemental Complaint at ¶ 26.

preempted by OCC regulations where the entity at issue was a wholly-owned subsidiary of a national bank. *Wachovia Bank* did not address whether the NBA applies to non-bank entities with an agency relationship to a national bank. SPGGC has not pled any facts to indicate that it is a subsidiary of a national bank, such that the NBA would apply to its activities. Additionally, the recently developed facts concerning U.S. Bank and Metabank do not affect the analysis. Affiliating itself with more than one national bank does not make it more likely that the NBA will apply to SPGGC. If U.S. Bank or Metabank were a plaintiff in this case, a different preemption analysis might be required, but the mere fact that SPGGC has a close relationship with those entities does not affect the preemption analysis as it applies to SPGGC.

Therefore, the CGCL is not preempted by the NBA, because it is physically possible to comply with both and SPGGC's compliance with the CGCL does not frustrate the purposes of Congress in enacting the NBA. There are no allegations of fact that will affect that conclusion, because preemption by the NBA does not apply to a non-bank entity, even if it has an agency or business relationship with a national bank. Therefore, SPGGC's complaint fails to state a claim based on NBA preemption.

### B. Commerce Clause

SPGGC's argument that the CGCL violates the Commerce Clause is misplaced; SPGGC mis-identifies what is in reality just a burden on SPGGC, as a burden on interstate commerce. SPGGC fails to show, as a matter of law, that the CGCL creates a disparate impact on interstate commerce as compared to intrastate commerce. SPGGC also conflates the *sale* of Simon giftcards with the *use* of Simon gift cards. It is necessary to distinguish between the two, because the CGCL only regulates the sale of gift cards.

-8-

The Commerce Clause grants Congress the power to "regulate Commerce with foreign Nations, and among the several states. . . ." UNITED STATES CONSTITUTION Art. I, § 8, cl. 3.  It has long been recognized that under the "dormant" Commerce Clause doctrine, a state's power to erect barriers against interstate trade is limited.  *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 216 (2d Cir. 2004).  That limitation is not absolute, however, because "the states retain authority under their general police powers to regulate matters of 'legitimate local concern,' even though interstate commerce may be affected."  *Maine v. Taylor*, 477 U.S. 131, 138 (1986).  Regulation of consumer protection is historically a matter of legitimate local concern.  *Cliff v. Payco General American Credits, Inc.*, 363 F.3d 1113, 1125 (11th Cir. 2004); *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 135 (1963).

There are three major ways that a state law can violate the dormant Commerce Clause.  First, if a state law clearly discriminates against out-of-state interests in favor of in-state interests, the law is per se invalid.  *Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978); *Freedom Holdings*, 357 F.3d 216.  The terms "in-state" and "out-of-state" economic interests refer to the parties using the stream of commerce, not the interests of the state itself.  *Freedom Holdings*, 357 F.3d at 218.  Second, when a law is neutral, meaning that is applies even-handedly to both in-state and out-of-state interests, courts use a "balancing" approach to determine whether it violates the dormant Commerce Clause.  If the law serves a legitimate local purpose with only incidental effect on interstate commerce, it will be upheld unless the burden on interstate commerce is "clearly excessive" in relation to the local benefit.  *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970); *Freedom Holdings*, 357 F.3d at 216.   Third, a law is also per se invalid "if it has the practical effect of extraterritorial control of commerce occurring entirely outside the boundaries

of the state in question." *Freedom Holdings,* 357 F.3d at 216.  The Second Circuit has held that

it is proper to analyze the "extraterritorial reach" either as an independent jurisdictional issue or

under the *Pike* balancing framework.  *Freedom Holdings,* 357 F.3d at 216 n.11.  "The Commerce

Clause protects the *interstate market, not particular interstate firms*, from prohibitive or

burdensome regulations."  *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 474 (1981)

(quoting *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 127-28 (1978)) (emphasis

supplied).

### 1.  *Clear Discrimination Standard and* Pike *Balancing Test*

The CGCL does not discriminate against out-of-state economic interests, because it

applies even-handedly to out-of-state and in-state giftcard sellers.  Additionally, the CGCL does

not incidentally burden out-of-state interests any more than it burdens in-state interests; as such,

it complies with the requirements of the *Pike* balancing test.

A state statute clearly discriminates when "it constitutes differential treatment of in-state

and out-of-state economic interests that benefits the former and burdens the latter."  *Freedom*

*Holdings*, 357 F.3d at 217.  The dormant Commerce Clause prohibits economic protectionism by

states that seek to benefit in-state economic interests against out-of-state competition.  *Id.*  Here,

there is no question that the CGCL does not discriminate against out-of-state economic interests;

the state statute applies equally to in-state and out-of-state gift card sellers.  It does not purport to

benefit in-state sellers of gift cards by regulating only out-of-state sellers.

Becausee the CGCL applies even-handedly to in-state and out-of-state economic

interests, the *Pike* balancing test applies.  Under the *Pike* test, SPGGC must first show that

"although [the state law is] apparently evenhanded, [it] actually imposes burdens on interstate

commerce that exceed the burdens on intrastate commerce." *Freedom Holdings*, 357 F.3d at

217.  Additionally, "the statute at a minimum must impose a burden on interstate commerce that

is qualitatively or quantitatively different from that imposed on intrastate commerce." *Id.*

(quoting *National Electric Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 109 (2d Cir. 2001) (hereinafter

*"National Electric"*)).  "If no such unequal burden [can] be shown, a reviewing court need not

proceed further." *Id.*  Thus, SPGGC must show that the CGCL has a disparate impact on

interstate commerce, as compared to the impact on intrastate commerce.  *Id.*

Considering the facts alleged in the light most favorable to SPGGC, the burden imposed

by the CGCL on interstate commerce is not quantitatively or qualitatively different from the

burden imposed on intrastate commerce.  SPGGC has not identified any in-state economic

interest that the CGCL favors at the expense of out-of-state interests.  The CGCL applies equally

to gift cards of in-state and out-of-state suppliers.  Thus, SPGGC has not alleged facts sufficient

to show that the CGCL will have a disparate impact on interstate commerce as compared to

intrastate commerce.

## 2. *Extraterritorial Analysis*

SPGGC argues, however, that the CGCL has an extraterritorial effect that disparately

impacts interstate commerce.  The Second Circuit has held that it is proper to analyze the

extraterritorial effect of a state statute as another way of showing that the statute has a disparate

impact on interstate commerce.  *Freedom Holdings*, 357 F.3d at 216 n.11.  The CGCL does not

violate the extraterritorial prong of the dormant Commerce Clause because the CGCL does not

apply to commerce conducted in other states.

A state statute may violate the dormant Commerce Clause if it regulates commerce

occurring wholly outside the borders of the state.  *Freedom Holdings*, 357 F.3d at 219.  Indeed,

one way that a party can show that a regulation has a disparate impact on interstate commerce is

to show that the regulation "has the practical effect of requiring out-of-state commerce to be

conducted at the regulating state's direction."  *National Electric*, 272 F.3d at 110.  That concept

has usually arisen in the context of price regulation cases.  *See, e.g.*, *Healy v. Beer Institute, Inc.*,

491 U.S. 324, 332 (1989); *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S.

573, 582 (1986).  Both *Healy* and *Brown-Forman* addressed state statutes that controlled prices

at which goods were sold in the state by regulating the price at which manufacturers could sell in

other states.  In those cases, the state statutes explicitly tied the in-state price of goods to the

prices being charged in other states.  Thus, the state regulations directly controlled commerce

conducted wholly out-of-state, because the state laws regulated the prices at which goods could

be sold in other states.  *Healy*, 491 U.S. at 332; *Brown-Forman Distillers Corp.*, 476 U.S. at 582.

 The Supreme Court held that if the practical effect of a state statute is to control conduct beyond

the boundaries of the state, it is invalid, even if the legislature did not intend it to have an

extraterritorial reach.  *Healy*, 491 U.S. at 337.  In determining the practical effect of a state

statute, courts should evaluate how the statute interacts with regulatory regimes of other states,

and the possibility of inconsistent legislation arising from the projection of one state's legislation

into another state.  *Healy*, 491 U.S. at 337.

    In contrast to the price regulation cases, in *National Electric*, 272 F.3d at 110, the Second

Circuit held that a Vermont statute requiring manufacturers to label mercury-bearing lamps was

constitutional.  The manufacturer argued that the law's extraterritorial reach violated the

Commerce Clause, because in order to comply with Vermont's restrictions, the manufacturer

would be forced to label all of its lamps wherever it sold them. *Id.* The Second Circuit rejected

that argument, because the Vermont statute was indifferent to whether lamps sold outside

Vermont had labels. *Id.* Unlike the price-regulation statutes that, by their very design, controlled

interstate commerce by locking manufacturers doing business in other states into the intrastate

price, the Vermont labeling statute only controlled the manufacturer's activities directed toward

Vermont. *Id.* The manufacturer was free to modify its production system so that it would not

have to label lamps sent to other states. *Id.*

The details of the Second Circuit's reasoning are instructive here. The manufacturer

contended that complying with Vermont's labeling statute would make the cost of production

much more expensive for the manufacturer and might force the manufacturer to withdraw from

the Vermont market completely. First, the Second Circuit reasoned, "it is axiomatic that the

increased cost of complying with a regulation may . . . [make] production become unprofitable."

*National Electric*, 272 F.3d at 111. Nevertheless, the decision to abandon or remain in that

state's market remains with the individual manufacturer. *Id.* As long as the state regulation is

even-handedly applied to out-of-state and in-state merchants, then there is no Commerce Clause

issue. Rather, it becomes a market-productivity decision for both in-state and out-of-state

merchants to consider whether they can recoup the costs of regulation in other areas of

production. *Id.*

Second, even if a merchant withdrew from the Vermont market altogether, that act would

not disproportionately affect interstate commerce in a way that would violate the Commerce

Clause. *Id.* More accurately, it would affect Vermont residents, who would not be able to

purchase mercury-bearing lamps – not the residents of other states, who would still be able to

purchase mercury-bearing lamps.

Finally, even if the Vermont regulation makes the cost of distributing lamps in Vermont so expensive that a manufacturer was forced to abandon the Vermont market, that concern is a policy matter that should be directed to the state legislature.  *Id.*  If a merchant makes a business decision that, based on the increased cost of complying with state regulations, he is no longer able to serve that market, that merchant himself and the consumers of that state may be injured. Those injuries do no constitute Commerce Clause violations, because (1) the residents of other states are not injured by that chain of events, and (2) other states are not required to adopt the same type of regulations.  *Id.*  Indeed, the Commerce Clause does not protect citizens of a state from the policy decisions of its legislature.  *Id.* at 112 (citing *National Paint and Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1132 (7th Cir. 1995)).

a. Application of the CGCL to the Sale of Gift Cards

SPGGC's arguments are similar to those that the Second Circuit rejected in *National Electric*.  As a preliminary matter, it is important to note that the CGCL applies only to the sale of gift cards in Connecticut.  Although it did not make that point at the hearing on the motion to dismiss, in its memorandum in support of its motion for reconsideration, SPGGC argues that the CGCL[4] is not limited to the sale of Simon gift cards in Connecticut, but rather could apply to gift

_____

[4] Conn. Gen. Stat. § 3-65c relates to the imposition of fees: "[a] holder of property may not impose on the property a dormancy charge or fee, . . . inactivity charge or fee, or any similar charge, fee or penalty for inactivity with respect to the property."  Conn. Gen. Stat. § 42-460 relates to expiration dates:

> No person may sell or issue a gift certificate that is subject to an expiration date.  No gift certificate or any agreement with respect to such gift certificate may contain language suggesting that an expiration date may apply to the gift certificate.

-14-

cards that are:  (1)  used in Connecticut no matter where they were originally sold, and (2) used in other states, but originally sold in Connecticut.  SPGGC argues that, because the CGCL does not specifically limit its application to sales in Connecticut, it must therefore apply to sales everywhere.

SPGGC's argument implies that any time a statute does not specifically limit its application to the state of issuance that it applies everywhere in the world.  State statutes often do not textually limit their application to the state of issuance, because it is axiomatic that a state statute typically applies to the state in which it has been passed as law.  According to firmly established rules of statutory construction, "unless the intention to have a statute operate beyond the limits of the state or country is clearly expressed or indicated by its language, purpose, subject matter, or history, no legislation is presumed to be intended to operate outside the territorial jurisdiction of the state or country enacting it."  73 AM. JUR. 2D, Statutes § 250; *see also Small v. United States*, ___U.S. ___, 125 S. Ct. 1752, 1755 (2005) (recognizing the presumption against extraterritorial application of statutes).  Here, the purpose of the CGCL is to protect Connecticut consumers.  Additionally, the State's enforcement action against SPGGC is expressly limited to the sale of gift cards in Connecticut.  State's Complaint, Prayer for Relief, 2.b-2.c.  Furthermore, the language of Conn. Gen. Stat. § 42-460 is limited to *sales* of gift certificates, not their use.  SPGGC stipulated at the hearing that each state with gift card regulation laws apply the laws only to the sale of the gift cards in the state.  Hearing Transcript at 34.  In sum, contrary to SPGGC's contention, the CGCL applies only to gift card sales in Connecticut.

b.  Practical Effect of the CGCL

Nevertheless, SPGGC argues, the CGCL has extraterritorial reach, because by requiring certain terms and conditions affecting the longevity of the Simon gift card, Connecticut "cloaks" the card with the requirements of Connecticut law regardless of where it is used.  Although it is undoubtedly true that the gift card would be cloaked with the requirements of the state of sale, that is not an unconstitutional violation of the Commerce Clause, because the CGCL does not force other states to adopt Connecticut's regulations for the sale of gift cards.

In the Supreme Court price regulation cases, the state statutes at issue had the practical effect of directly controlling how commerce was conducted in other states by setting the price at which sellers could sell goods in other states.  The same is not true here, however, because Connecticut is not forcing other states to adopt its regulations for the sale of gift cards.  Rather, this case is like *National Electric*; Connecticut regulates the sale of gift cards in Connecticut, in much the same way that Vermont regulated the labeling of lamps sold in Vermont.  Just because SPGGC might suffer a lower profit by complying with the Connecticut regulations does not mean that the CGCL violates the Commerce clause.  *See id.* at 111.  "Such burden is simply attributable to legitimate intrastate regulation.  The manufacturers are not required to adhere to the Vermont rule in other states."  *Id.* at 111.  SPGGC claims that it is required to adhere to the Connecticut rule in other states by virtue of the fact that the Simon gift card remains programmed according to the requirements of Connecticut law, even if it is subsequently used in other states.  That claim is erroneous, however, because the Connecticut law only affects the discrete moment in time when SPGGC sells a gift card in Connecticut.

Even though cards sold in Connecticut remain cloaked with the requirements of

-16-

Connecticut law, other states are free to regulate sales of gift cards in their own states in whatever way they see fit; indeed, those cards will remain cloaked with the requirements of those other states. The CGCL does not force other states to adjust their regulatory regimes. Contrary to SPGGC's assertion that Connecticut is regulating commerce beyond its borders, the CGCL merely regulates the sale of gift cards in Connecticut. Similarly, every other state can regulate the sale of gift cards within their borders. The location where the card is used is irrelevant, because the CGCL restricts sales of gift cards, not their use. If a card is sold in Connecticut and used in another state, that state is not forced to comply with the Connecticut laws applying to the sale of gift cards.

c. Withdrawal from Connecticut Market

SPGGC also argues that the CGCL violates the Commerce Clause, because Visa will not allow member banks to issue Visa products without an expiration date. Because the CGCL does not permit expiration dates, SPGGC could not sell Visa-branded electronic payment instruments in Connecticut, where Visa is the largest national provider of such services. That is the argument that the Second Circuit rejected in *National Electric*. Even if SPGGC withdrawls from the Connecticut market entirely, because it cannot issue a Visa product, that is not an interstate commerce issue – it is a policy issue about the wisdom of the intrastate regulations. Because the CGCL does not discriminate against out-of-state interests, the *Pike* balancing test applies. Under that test, SPGGC is required to show that the burden placed on out-of-state economic interests is qualitatively or quantitatively different than that placed on in-state interests. If no such unequal burden can be shown, a reviewing court does not need to proceed any further. SPGGC has shown that it might be burdened by the CGCL but has failed to show that its burden is unequal to

-17-

the burden placed on in-state economic interests, which also will not be able to issue Visa products.

### d. Inconsistent Regulatory Regimes

SPGGC further argues that if states are allowed to individually regulate gift card sales, it will create inconsistent regulatory systems, and SPGGC will be forced to comply with the most restrictive regime.  That conclusion is erroneous.  *See National Electric*, 272 F.3d at 112.  First, SPGGC is not forced to comply with the most restrictive regime.  As the Second Circuit held in *National Electric*, SPGGC can adjust its production and distribution system to comply with the varying markets it serves.  Such modifications are easier for SPGGC than the Vermont manufacturer in *National Electric*, because SPGGC can make its product comply with different regimes simply by electronically programming the gift card, rather than physically changing the labeling and production.

Second, SPGGC implicitly claims that the Simon gift card, which operates like a Visa card, is more analogous to transportation cases than to cases involving manufactured products, because a gift card is more easily transported through the channels of interstate commerce.  In interstate transportation cases, the burden on interstate commerce due to inconsistent state regulations is more often disparately high, because interstate trains, trucks, and buses must travel through various states in order to transport goods from point A to point B.  They must comply with the rules of each state or avoid a state completely, and avoiding a state would affect their ability to conduct commerce with the surrounding states.  *National Elec*tric, 272 F.3d at 111-12 (citing *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429 (1978); *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520 (1959)).

-18-

Even if, as Simon argues, its gift card is analogous to an abstract transportation network, that does not change the fact the CGCL only applies to the sale of gift cards, not to the use of gift cards, so the inconsistency concerns raised by the transportation cases do not affect the gift card. When the gift card is sold, SPGGC can program the card electronically with whatever restrictions are required in the state where it is sold.  If the card is subsequently used in another state, SPGGC will not have to re-program the card to comply with the second state's laws, because no gift card *sale* has occurred; rather the consumer has merely chosen to *use* the gift card in the second state.

Finally, SPGGC argues that if each state can regulate gift card sales it will produce inconsistent regulations for the purchaser, user, SPGGC, and the merchant that accepts the card. "A state regulation might impose a disproportionate burden on interstate commerce if the regulation is in substantial conflict with a common regulatory scheme in place in other states." *National Electric*, 272 F.3d at 112.  "It is not enough to point to a risk of conflicting regulatory regimes in multiple states; there must be an actual conflict between the challenged regulation and those in place in other states." *National Electric*, 272 F.3d at 112.  Moreover, there is some authority to suggest that the inconsistent regulatory scheme argument only applies in transportation cases.  *National Electric*, 272 F.3d at 112 (citing Donald H. Regan, *Siamese Essays: (I) CTS Corp. v. Dynamics Corp. Of America and Dormant Commerce Doctrine; (II) Extraterritorial State Legislation*, 85 Mich. L. Rev. 1865, 1883 (1987) (indicating that inconsistent regulation for dormant Commerce Clause purposes may be "limited to transportation cases.")).

Even if the inconsistent regulation argument applied here, however, it does not present

the same burden on commerce that inconsistent regulations might for manufacturers of tangible goods.  In this case, however, the Simon gift card only needs to comply with one set of regulations – those of the state in which it is sold.  There may be a minimal burden on SPGGC to learn the regulations of various states so that it can properly program the cards to comply with the regulations of the states where they are sold, but that burden is part of the cost of doing business.  The only potential regulatory conflict that might arise is if one state regulates the sale of gift cards and another regulates the use of gift cards.  In that scenario, SPGGC might face inconsistencies akin to the truck drivers in the transportation cases, because the restrictions placed on the card could change if the card traveled from state to state.  However, SPGGC has not alleged that any such conflict currently exists.  According to Supreme Court and Second Circuit precedents, in order for the interstate regulatory conflict argument to prevail a party must demonstrate an actual conflict, not a hypothetical one.  *National Electric*, 272 F.3d at 112.

e.  Internet Sales of the Simon Gift Card

When Connecticut regulates the sale of gift cards it is not regulating the Internet per se.  The CGCL sets specific standards for how gift cards must be sold; if SPGGC sells a gift card to a Connecticut consumer, then the CGCL applies.  SPGGC cites *American Booksellers Foundation v. Dean*, 342 F.3d 96, 103 (2d Cir. 2003), for the proposition that it is difficult for a state to "regulate internet activities without projecting its legislation into other states."  That case, however, is distinguishable from this one, because it dealt with the constitutionality of state laws prohibiting the dissemination of pornography to minors over the internet.  The court held that the statutes were unconstitutional because out-of-state individuals posting material to the web sites could not prevent it from entering the regulating state and therefore had to comply with the laws

of the regulating state. *Id.* Unlike that case, the CGCL does not regulate the content of SPGGC's website.

Rather, the issue in this case is that once a consumer orders a Simon gift card online, the CGCL mandates that, if that consumer has a Connecticut billing address, SPGGC must sell the gift card according to the CGCL regulations. In *Ford Motor Co. v. Texas Dept. of Transportation*, 106 F. Supp. 2d 905, 909 (W.D. Tex. 2000), the court "rejected the plaintiff's argument that an activity which is appropriately regulated when accomplished through any other medium becomes sacrosanct when accomplished through the internet." If that were the case, "then all state regulatory schemes would fall before the mighty alter of the internet." *Id.* The Fifth Circuit affirmed, holding that "the incidental regulation of internet activities does not violate the Commerce Clause." *Ford Motor Co. v. Texas Department of Transportation*, 264 F.3d 493, 505 (5th Cir. 2001). SPGGC is not challenging a law regulating the content of the internet; rather it is challenging a consumer protection law that regulates the sale of gift cards that are incidentally sold over the internet. When someone buys a Simon gift card on the internet, SPGGC can easily conform to the laws of the state where the consumer lives. It does not need to alter its website to conform the entire website to Connecticut's regulations. Rather, SPGCC must adjust the logistics of the actual online order and sale process. As such, Connecticut is not projecting its regulations into other states, because SPGGC will not be forced to make all sales comply with the CGCL – just sales to consumers with Connecticut billing addresses. If SPGGC does not want to account for Connecticut consumers, then it can choose not to sell to Connecticut consumers. There is nothing about the added component of internet sales that alters the fact that the CGCL is simply regulating sales of Simon gift cards to Connecticut consumers.

Thus, considering the facts in the light most favorable to SPGGC, it has failed to state a claim that the CGCL has an extraterritorial reach, such that it has a disparate impact on interstate commerce as compared to commerce within Connecticut.  All that SPGGC has alleged is that SPGGC itself is burdened by the CGCL; that is not a Commerce Clause violation, but is rather one of the costs of doing business in this state.  SPGGC presented no new law, evidence, or indication of manifest injustice to justify changing the court's Ruling.

### III.  Conclusion

SPGGC's Motion to Reconsider (**doc. # 43-1**) is GRANTED.  Having reconsidered the Ruling, the court declines to modify that decision.

It is so ordered.

Dated at Bridgeport, Connecticut, this 5th day of January 2006.

   /s/ Stefan R. Underhill
                Stefan R. Underhill
                United States District Judge